# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 19-00400-01-CR-W-SRB |
| ) | |
| HERMAN R. MARTINEZ, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION TO
## DENY DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant Herman Martinez's Motion to Suppress Evidence. Doc. 19. Defendant moves the Court to suppress heroin recovered in a search incident to an arrest. For the following reasons, Defendant's motion should be denied.

### I. PROCEDURAL BACKGROUND

On December 11, 2019, the grand jury returned a one-count Indictment charging Defendant with possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A). Doc. 10. Defendant filed his motion to suppress evidence on March 31, 2020, seeking suppression of all evidence obtained during his arrest and subsequent search, specifically the nearly two kilograms of heroin found taped around his waist. Doc. 19. The Government filed its response on May 14, 2020. Doc. 22.

An evidentiary hearing was initially set on July 30, 2020. Doc. 23. The hearing was continued for various reasons, most notably, the need for the parties to address discovery issues relevant to the suppression motion. Upon a motion by the parties on October 16, 2020, this Court issued a protective order addressing certain discovery concerns. Doc. 38. Shortly thereafter, the

evidentiary hearing was again continued for health reasons related to the pandemic, with it ultimately being held on January 12, 2021. Docs. 44, 50.

The hearing was held with all parties and counsel appearing in person. The Government called Kansas City, Missouri Police Department Detective Antonio Garcia, DEA Supervisory Chemist Sara Norris, and, as a rebuttal witness, DEA Senior Research Chemist Sini Panicker to testify. Heather Harris, a forensic chemistry consultant, testified for Defendant Martinez. Detective Garcia testified in person, with the remaining witnesses testifying via Webex with Defendant Martinez's consent. The following exhibits were admitted into evidence:

> Government's Exhibit 1: Surveillance Video from bus station (Chapters 1, 2, and 14)
> Government's Exhibit 2: Photograph of Defendant's bus ticket
> Government's Exhibit 3: Photograph of Defendant's identification
> Government's Exhibit 4: Photograph of bus station interior
> Government's Exhibit 5: Photograph of bus station exterior
> Government's Exhibit 6: Photograph of Defendant
> Government's Exhibit 7: Photograph of Defendant's back while wearing white t-shirt
> Government's Exhibit 8: Photograph of Defendant's back with shirt lifted
> Government's Exhibit 9: Photograph of Defendant's back with heroin bundles
> Government's Exhibit 10: Photograph of heroin bundles being removed
> Government's Exhibit 11: Photograph of four heroin bundles
> Government's Exhibit 12: Photograph of four heroin bundles
> Government's Exhibit 13: Photograph of one heroin bundle
> Government's Exhibit 14: Photograph of one heroin bundle partially opened
> Government's Exhibit 15: Photograph of one heroin bundle opened
> Government's Exhibit 16: Heroin seized from Defendant
> Government's Exhibit 17: Photograph of heroin after DEA examination in evidence bag
> Government's Exhibit 18: Photograph of evidence label
> Government's Exhibit 20: C.V. of Sara Norris, DEA Supervisory Chemist
> Government's Exhibit 21: DEA Chemical Analysis Report
> Government's Exhibit 25: C.V. of Sini Panicker, DEA Senior Research Chemist
> Government's Exhibit 26: Screen Capture of bus station interior with Defendant marked with an "x"
> Government's Exhibit 27: Screen Capture of bus station interior with Defendant marked with an "x" and law enforcement officers marked with circles
> Government's Exhibit 28: Screen Capture of bus station interior with Defendant marked with an "x" and law enforcement officers marked with circles
> Defendant's Exhibit 504: Photo of one heroin bundle
> Defendant's Exhibit 510: Video screen shot 09:16:41
> Defendant's Exhibit 512: C.V. of Heather Harris, Forensic Chemistry Consultant

Closing arguments were presented, after which the Court took the matter under advisement.

## II. **PROPOSED FINDINGS OF FACT**

On the basis of the evidence presented at the suppression hearing, the undersigned submits the following proposed findings of fact:

1.  Detective Antonio Garcia has been employed as a police officer for the Kansas City, Missouri Police Department for 24 years. Tr. at 12-13. Since 2002, he has been assigned to the Drug Enforcement Unit, and he has been a K-9 handler since 2006. Tr. at 13. His training includes yearly attendance at narcotics conferences and K-9 conferences, and he conducts a minimum of four hours of training with his K-9 weekly. Tr. at 14-15. In order to train his K-9, K-9 Zina at the time of the events of this case, he has numerous training aids which are samples of controlled substances including heroin. Tr. at 15.

2.  Detective Garcia is currently assigned to the Greyhound bus station, Amtrak station, Fedex facility, UPS facility, and United States Postal Service facility, where he looks for individuals and packages coming from known source cities for narcotics. Tr. at 14.

3.  When performing interdiction duties at the Greyhound bus station, Detective Garcia and the other officers will dress in plain clothes, with their badges concealed under their clothing. Tr. at 16-17, 65. Detective Garcia and the other officers usually arrive at the station at 6 a.m. and wait for buses to arrive from various source cities, including Los Angeles, California. Tr. at 16.

4.  Detective Garcia will speak with multiple people traveling from a source city. Tr. at 16. He has had thousands of consensual encounters with individuals over the course of his career and has made hundreds of drug trafficking arrests. Tr. at 17-18. Detective Garcia has encountered several hundred so-called "body carriers" or people who are concealing narcotics on their body. Tr. at 17-18. It is common for body carriers to carry narcotics around their waist, on their torso, their legs, and in their clothing. Tr. at 17.

5.  On November 18, 2019, Detective Garcia was working at the Greyhound bus station with K-9 Zina and five other officers when a bus from Los Angeles, California arrived. Tr. at 19-20, 65-66. When the bus arrived, Detective Garcia took his K-9 to the exterior luggage compartments located underneath the bus to conduct a sniff check. Tr. at 20, 26-27; Ex. 1, Ch. 14 at 9:02:57.[1] Three other officers were waiting in the sidewalk area immediately in front of where the bus parked. Ex. 1, Ch. 14 at 9:02:57.

---

[1] When applicable, timestamps for video exhibits refer to the timestamps seen in the upper left of the video footage. As discussed by counsel, these timestamps do not necessarily coincide with the actual time the events depicted therein occurred, nor is it clear if any discrepancies between timestamps and the actual time are uniform across all surveillance videos admitted into evidence. Tr. at 33, 80-81

3

6.     Detective Garcia's K-9 first entered the luggage compartment on the right side of the bus farthest back from the passenger door. Tr. at 20, 67-68. K-9s are trained to sit as an "alert" or final response to indicate that they have discovered the source of a drug odor, but raising their noses and pulling their handlers in a particular direction can indicate that they smell narcotics and are attempting to find the actual source. Tr. at 21-22. Detective Garcia's K-9 was sniffing the luggage in the luggage compartment when she raised her nose in the air, jumped out of the compartment, and began pulling Detective Garcia towards where passengers were exiting the bus. Tr. at 20-21. Based on Detective Garcia's training and experience, K-9 Zina's behavior indicated to him that she was "in the apparent odor of narcotics." Tr at 21.

7.     Detective Garcia testified that while he was waiting for passengers to the exit the bus, he could smell the "strong" odor of heroin coming from the door where passengers were exiting. Tr. at 22. Detective Garcia testified that he noticed the odor at the moment when the passenger door opened while he was at the luggage compartment near the back of the bus and K-9 Zina began pulling towards the passenger door. Tr. at 69.

8.     Detective Garcia is familiar with the odor of heroin due to his training and experience, including his use of training aids with his K-9. Tr. at 22. Detective Garcia describes heroin as having the "strong odor of vinegar." Tr. at 22.

9.     Detective Garcia further testified that he advised Detective Lanaman that he could smell the odor of heroin. Tr. at 23.

10.     While Detective Garcia was standing at the luggage compartments outside of the bus with his K-9, Defendant Martinez exited the bus. Tr. at 27; Ex. 1, Ch. 14, 9:04:27. Defendant Martinez was wearing a black ball cap, white shirt, and a black jacket with grey sleeves and was carrying a duffel bag. Tr. at 28; Ex. 1, Ch. 14, 9:04:30.

11.     Defendant Martinez then walked into the bus station, pausing and holding the door open for another passenger as he walked inside. Ex. 1, Ch. 14, 9:04:40-50. Agent Marriott can be seen standing near the door as Martinez walked through. Tr. at 72-73; Ch. 14, 9:04:40-50. Within seconds of Defendant Martinez walking into the bus station, Detective Pruitt and Task Force Officer Willingham exited the station through the same door. Tr. at 28, 73-74; Ex. 1, Ch. 14, 9:04:54-56. Government's Exhibit 4 depicts the interior of the station, Tr. at 37-38, and of the door walked through by Martinez and the officers. Detective Garcia testified that none of the other officers present that day reported to him that they detected the odor of heroin. Tr. at 74-75.

12.     Defendant Martinez, after entering the bus station, walked to the passenger seating area, placed his duffel bag on the floor, and sat down. Tr. at 35; Ex. 1, Ch. 2, 9:05:00-15; Ex. 26 (video still with Defendant Martinez's location marked with an "x"). He sat there for roughly eleven minutes before Detective Garcia entered the seating area. Tr. at 38; Ex. Ch. 2, 9:16:40-45.

13.     Detective Garcia entered the bus with his K-9 to conduct a sniff check but exited as there were still passengers on board. Tr. at 23. Detective Garcia waited for the remaining passengers to exit the bus before re-entering the passenger compartment with his K-9 to conduct a sniff check inside the bus. Tr. at 23-24. To conduct a sniff check, Detective Garcia and his K-9 board the bus, and, starting from the back and moving forward, they check any luggage left on the bus in the

4

overhead bins and on the seats. Tr. at 24. On this occasion, K-9 Zina did not alert or give any other indicators that narcotics were present inside of the passenger compartment. Tr. at 24.

14. Detective Garcia exited the bus, and after using his K-9 to assist another detective with a sniff check, he put K-9 Zina away so that he could enter the bus station. Tr. at 25. Greyhound allows law enforcement officers to use their K-9s outside and on buses, but they have a policy against bringing K-9s into the bus station. Tr. at 25, 32, 79, 102.

15. Detective Garcia then entered the station with Detective Lanaman. Tr. at 33; Ex. 1, Ch. 14, 9:16:18. Detective Garcia testified that his plan was to locate the source of the heroin he had smelled earlier. Tr. at 33. When he walked into the lobby with Detective Lanaman, he testified that he could again smell the odor of heroin. Tr. at 33. The video footage briefly depicts Detective Garcia with Detective Lanaman walking past the ticket counter towards the lobby seating area, with the doors they had just entered through out of the camera's view. Tr. at 34-35; Ex. 1, Ch. 1, 9:16:20-29. Detective Garcia can be seen re-entering the camera's view in the upper left-hand corner of the video footage walking into the passenger seating area. Ex. 1, Ch. 1, 9:16:20-29. He testified that he could smell the odor of heroin in this area. Tr. at 35.

16. When Detective Garcia entered the seating area, he approached Defendant Martinez. Tr. at 38-39; Ex. 1, Ch. 2, 9:16:46. At the time that he approached Defendant Martinez, Detective Pruitt was standing roughly 20 feet away, farther back in the seating area relative to the video camera. Tr. at 41; Ex. 1, Ch. 2, 9:16:47; Ex. 27; Ex. 28. Detective Lanaman and Task Force Officer Riggins were standing roughly 30 feet away, closer to the camera. Tr. at 40; Ex. 1, Ch. 2, 9:16:47; Ex. 27. The officers did not plan in advance where they would stand in the passenger seating area, and the other officers were not aware that Detective Garcia had begun speaking with Defendant Martinez. Tr. at 85.

17. Detective Garcia approached Defendant Martinez, identified himself as a detective doing drug enforcement, and presented his badge and police identification card. Tr. at 41. Defendant Martinez did not respond. Tr. at 41. Detective Garcia asked if he could speak with him, and Defendant Martinez said "yes." Tr. at 42. Detective Garcia asked to see Defendant Martinez's bus ticket and identification, and Defendant Martinez provided a bus ticket. Tr. at 42; Ex. 2. Detective Garcia has observed numerous tickets over the years and is able to quickly examine them for pertinent information. Tr. at 44. Detective Garcia noticed that Defendant Martinez was traveling from Claremont, California to Newark, New Jersey, and that the ticket was purchased with cash. Tr. at 43. Detective Garcia testified that it is common for narcotics couriers to pay for tickets with cash. Tr. at 43. Detective Garcia returned the ticket to Defendant Martinez after examining it for "a couple of seconds." Tr. at 44

18. Defendant Martinez then provided Detective Garcia with a U.S. Passport Card. Tr. at 44, Ex. 3. Detective Garcia noticed that the name on the passport card matched the name on the bus ticket. Tr. at 45. He handed the card back after approximately two seconds. Tr. at 45. Detective Garcia testified that he could smell the odor of heroin while he was talking to Defendant Martinez. Tr. at 45. Detective Garcia did not tell Defendant Martinez that he detected the odor of heroin. Tr. at 45.

19.     Detective Garcia asked Defendant Martinez if he could search his duffel bag.  Tr. at 45. Defendant Martinez consented to the search, and Detective Garcia searched the bag, finding no contraband.  Tr. at 46.  At this time, the two officers who were originally standing 30 feet away had walked farther away, and the detective standing 20 feet away was still in the same position.  Tr. at 47; Ex. 1, Ch 2, 9:17:30 - 9:18:00; Ex. 28.

20.     Detective Garcia next asked Defendant Martinez if he could search his person, and Defendant Martinez gave him permission to do so.  Tr. at 47-48.  Defendant Martinez stood up and began removing items from his pocket, and Detective Garcia began searching the lining of Defendant Martinez's jacket.  Tr. at 48; Ex. 1, Ch. 2, 9:18:30.  Detective Garcia then reached around to the back of Defendant Martinez's waist where he felt a large bundle.  Tr. at 48.  At that point, Defendant Martinez struck Detective Garcia's arm to move it away from the bundle.  Tr. at 48. Detective Garcia testified that based on his experience, the hard-shaped object was consistent with suspects carrying large amounts of narcotics concealed on their person.  Tr. at 48.

21.     Upon feeling the bundle, Detective Garcia placed Defendant Martinez under arrest.  Tr. at 49, 91; Ex. 1, Ch. 2, 9:18:50.  Other officers, including Detective Lanaman, came to assist as Detective Garcia handcuffed Defendant Martinez and brought him to a room in the back of the bus station.  Tr. at 49, 51, 91; Ex. 1, Ch. 2, 9:18:50 - 9:19:20.  At no point during this encounter, up to the moment Detective Garcia's hand was hit away, did Defendant Martinez ask to leave or attempt to end the conversation, nor was he prevented from leaving, blocked from moving, or told that he was not free to leave.  Tr. at 49-50.

22.     In the back room at the bus station, a series of photographs were taken to document the search of Defendant Martinez including the removal of the bundle.  Tr. at 53-54; Ex. 6-15. Defendant Martinez was wearing a second, white shirt under his outer t-shirt, and the large bundle strapped around his waist can be seen under that shirt.  Tr. at 55, Ex. 8.  The bundle was strapped around his waist with several layers of cellophane which an officer removed with a knife.  Tr. at 56, 95; Ex. 9, 10, 504.  Four bundles were individually wrapped in more cellophane, with a layer of black carbon paper under that cellophane.  Tr. at 57, 96; Ex. 11, 12.  Black carbon paper is used to conceal odors.  Tr. at 96.  Under the black carbon paper was a layer of packing tape, and under the packing tape were at least two more layers of cellophane.  Tr. at 57, 58; Ex. 13, 14.  There was a menthol rub between some of the layers of cellophane under the packing tape.  Tr. at 57, 98; Ex. 14.  Detective Garcia testified that menthol rub is a masking agent used to cover up the odor of narcotics.  Tr. at 58.  Detective Garcia testified that he did not smell menthol rub when he was in the bus station.  Tr. at 98.  A field test of the bundled substance tested positive for heroin.  Tr. at 59.

23.     Detective Garcia identified Government Exhibit 16 as being the heroin he seized from Defendant Martinez, and he identified Exhibits 17 and 18 as photographs accurately depicting the same.  Tr. at 61.

24.     Throughout his encounter with Defendant Martinez, Detective Garcia testified that Defendant Martinez spoke and understood English, appeared to understand Detective Garcia, and did not at any point ask for clarification.  Tr. at 100, 104.

6

25. Detective Garcia has been with some of the other task force officers present that day on other occasions when heroin was seized. Tr. at 105.

26. Detective Garcia has observed heroin and other narcotics packaged similarly to what he observed on Defendant Martinez. Tr. at 104.

27. Sara Norris is a supervisory chemist with the DEA. Tr. at 109-10. She was previously a senior forensic chemist, and her responsibilities included analyzing evidence for the presence of controlled substances. Tr. at 110. Her analysis would include qualitative analysis, which is identifying a substance, and quantitative analysis, which involves determining how much of a particular substance is in a sample. Tr. at 111. Quantitative analysis is also referred to as testing the purity of a sample. Tr. at 111.

28. Over the course of her career, Sara Norris has identified heroin well over 3,000 times. Tr. at 112.

29. The DEA laboratory uses a Laboratory Information Management System, or LIMS, which is used to track evidence as it moves through the laboratory to various specialists. Tr. at 119. Sara Norris received the heroin – previously identified by Detective Garcia – through the LIMS system, and returned it consistent with LIMS protocols. Tr. at 122-24, 124. The heroin – Exhibit 16 – was properly packaged, sealed, and labeled when she received it. Tr. at 121. Exhibit 16 was in the same or similar condition in the courtroom as when Sara Norris last saw it. Tr. at 123. The evidence label indicates that the agency received the heroin on November 18, 2019; Sara Norris received and opened the heroin on December 5, 2019; and it was re-sealed by her on December 11, 2019. Tr. at 153-54; Ex. 18.

30. When Sara Norris received the heroin in the laboratory, she began unpacking the four bundles, and after unwrapping those, there were two units inside each bundle, giving a total of eight units. Tr. at 123.

31. Sara Norris performed a Marquis Color Test and gas chromatography-mass spectrometry (GC-MS) on the samples. Tr. at 124-25. The Marquis Color Test and GC-MS are commonly used and widely accepted in the forensic sciences community. Tr. at 124. These tests indicated that the evidence was, in fact, heroin. Tr. at 126. Sara Norris prepared a report setting forth her findings. Tr. at 126-27; Ex. 21.

32. Based on Sara Norris's experience and observations, a vinegar-type odor is commonly associated with heroin. Tr. at 129. She testified that the vinegar odor is commonly affiliated with acetic acid or acetic anhydride. Tr. at 129. She does not test for acetic acid or acetic anhydride in her analyses. Tr. at 129-30.

33. Sara Norris has personally experienced a vinegar-type odor when working with heroin samples in the lab. Tr. at 130. She does not document whether or not a sample has a vinegar odor in her reports as it is common and thus not out of the ordinary. Tr. at 130.

34. Heroin is produced by combining morphine with acetic anhydride. Tr. at 160, 204-07. This creates heroin base, which can then be run through additional purification steps depending on the

end result desired. Tr. at 160, 204-07. Acetic anhydride has a sharp, pungent odor similar to vinegar. Tr. at 162, 205.

35. Heroin is described on a public, government database maintained by scientists as an odorless compound. Tr. at 164-65. The general, scientific consensus is that pure heroin which is processed properly has no odor. Tr. at 215.

36. Heroin can begin to have an odor upon prolonged exposure to air. Tr. at 166, 174. Exposure to air causes the release of the acetyl groups in the compound which can cause a vinegar-like odor. Tr. at 174. The presence of other substances or adulterants in a sample can cause other odors as well, which can sometimes mask any vinegar-like odor that is present. Tr. at 208-09. Only trace amounts of certain substances, including acetic acid, are required to emit a strong odor. Tr. at 210-11.

37. The odor of heroin can also be affected by how it is processed. Tr. at 204-07. A series of purification steps are needed, and if not all of them are done or they are done improperly, a vinegar-like odor may remain. Tr. at 205, 206-07. Even heroin with 97% or 98% purity can emit an odor if it was not processed properly. Tr. at 213.

38. A sample of the heroin in this case was subjected to secondary testing which determined that the sample was 93.9% pure. Tr. at 168. This is considered a "highly pure" sample. Tr. at 168, 172-73.

39. A sample of the heroin in this case also underwent solvent analysis. Tr. at 169. The solvent analysis indicated that there was ethyl acetate and acetone present in the sample. Tr. at 169-71. Neither ethyl acetate or acetone have an odor similar to vinegar. Tr. at 170-171. The secondary testing did not identify everything present in the sample. Tr. at 175.

40. The DEA does not test for acetic acid in its secondary testing. Tr. at 209-10. This is because it is commonly present in samples and identifying acetic acid does not provide the DEA with useful information for law enforcement or intelligence purposes. Tr. at 211, 233. When DEA chemists smell a vinegar like smell in a sample of heroin, testing is not necessary to explain the source of the smell. Tr. at 223.

41. Heather Harris's educational background includes a Master of Forensic Science degree from George Washington University. Tr. at 156; Ex. 512. Her professional experience includes work as a forensic scientist and forensic chemist for government laboratories, and as a forensic chemistry consultant for various clients. Tr. at 156-57; Ex. 512.

42. Sini Panicker's educational background includes a Master's degree in Chemistry and Ph.D. coursework. Tr. at 194; Ex. 25. She has worked for the DEA since 1997 and is currently a senior research chemist. Tr. at 194, 195-96; Ex. 25. She is considered the DEA's subject-matter expert on heroin and heroin production. Tr. at 200-02.

## III. PARTIES' ARGUMENTS

Defendant Martinez argues that his encounter with Detective Garcia at the Greyhound bus station was an illegal seizure and illegal arrest. He acknowledges that when Detective Garcia first approached him and asked to search his duffel bag, the interaction and search of the bag was consensual. However, he contends he was seized when Detective Garcia continued the encounter after determining that the bag did not contain anything illegal. He argues that not only was he seized, but that Detective Garcia lacked reasonable suspicion to justify the alleged seizure and subsequent physical touching where Garcia felt the bundle – which was later revealed to be heroin – attached to Martinez's waist.

In so arguing, Martinez specifically challenges Detective Garcia's assertion that he detected the odor of heroin. Martinez claims that without the odor of heroin, Garcia could only rely on "general interdiction indicators" to justify the seizure, and that courts have expressly ruled that such indicators do not support a reasonable suspicion. Defendant Martinez also claims that Eighth Circuit cases have established that detecting a bulge under clothing does not justify further searching when it is clear that the bulge is not a weapon, as it clearly was not in this case; nor does detecting a bulge, without more, provide probable cause for an arrest. Without the odor of heroin, he argues that his eventual arrest and search were illegal, requiring all evidence obtained thereby to be suppressed.

The Government responds that the entire encounter between Defendant Martinez and Detective Garcia was consensual, and that after consensually searching Martinez and feeling a bundle under Martinez's clothing, Detective Garcia had enough information to establish probable cause to render the arrest and subsequent search lawful.

## IV. DISCUSSION

There are a few exceptions to the Fourth Amendment's requirement "that a warrant be issued by a neutral magistrate [judge] on probable cause before an item can be searched or seized…, [and if] the government wishes to rely on an exception, it bears the burden of demonstrating that the exception exists." *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003) (internal citations omitted).

"Although the Fourth Amendment prevents police from seizing a person without a reasonable suspicion of criminal activity, the Amendment is not triggered by a consensual encounter between an officer and a private citizen." *United States v. Villa-Gonzalez*, 623 F.3d 526, 531 (8th Cir. 2010). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search . . . provided they do not induce cooperation by coercive means." *Id.* at 531 (citation omitted). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *Id.*

An initially consensual encounter can become non-consensual, and thereby trigger application of the Fourth Amendment, when the totality of the circumstances would lead a reasonable person to believe that he was not free to leave or end the encounter. *United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012). In examining the totality of the circumstances, courts consider seven non-exclusive factors:

> [O]fficers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

10

*Id.* (quoting *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008)); *see also, United States v. Garcia*, 888 F.3d 1004, 1009 (8th Cir. 2018). Determining if an encounter is non-consensual, and thus subject to the Fourth Amendment, is a fact-intensive inquiry which "turns on the unique facts of each case." *Id.* "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Griffith*, 533 F.3d at 983. It is the Government's burden to prove voluntary consent. *Aquino*, 674 F.3d at 923.

Detective Garcia first approached Defendant Martinez inside the bus station (Fact 16), and although Defendant directly questions Detective Garcia's assertion that he was following the odor of heroin in the station lobby (Fact 15), the parties agree that the encounter was initially consensual. Doc. 19, pp. 2, 5, 6; Tr. at 239. Detective Garcia inquired of Defendant Martinez's travel plans; requested, reviewed, and returned Martinez's identification and bus ticket; and asked Martinez's consent to search his duffel bag, which Martinez freely gave. Facts 17, 18, 19. After searching the bag and finding no contraband, Detective Garcia then asked Defendant Martinez if he could search his person. Fact 20. It is at this moment that Defendant Martinez argues the encounter ceased to be consensual.

When considering the above factors at this moment, there were three other law enforcement officers in the vicinity of Detective Garcia and Defendant Martinez, though all of them wore plain clothes with their badges concealed under their clothing. Facts 3, 18, 19. There is no evidence that the officers displayed weapons, if they were even carrying them. There is also no evidence that Martinez was aware of the other three officers, and Detective Garcia testified that the other officers did not notice that he had approached Martinez. Fact 16. Detective Garcia testified that the next closest officer was roughly twenty feet away, with two more farther away still. Facts 16,

11

19. Government's Exhibit 27, a still image from the surveillance footage marked by Detective Garcia during the evidentiary hearing, clearly illustrates the considerable distance at which the other plain-clothed officers stood. Indeed, the two officers closest to the camera initially appear to be conversing with each other more than they noticed the encounter across the lobby. Ex. 1, Ch. 2, 9:18:20-30, Ex. 27; *see also* Fact 16. Members of the public could and did walk between the other officers and the ongoing encounter, as seen in Government's Exhibit 28, where, for example, a member of the public is seen directly between Defendant Martinez and the next closest officer. Thus, although there were several officers present, they were not conspicuous, they were not restricting Defendant Martinez's freedom of movement, nor were they behaving in a threatening manner towards Defendant Martinez, if they were even noticed.

Furthermore, none of the evidence indicates that Detective Garcia used a threatening tone or demanded compliance. Although he briefly inspected Martinez's identification and bus ticket, he quickly returned those prior to asking for consent to search Martinez's bag and then his person. Facts 17, 18. Finally, there is no evidence that Detective Garcia indicated that Martinez was specifically the subject of an investigation.

Defendant Martinez also argues that because he was a bus traveler in the middle of a cross-country journey, it was not practical for him to leave the area to terminate the encounter. He has cited no precedent that this should materially alter this analysis, and although it might be impractical for Defendant Martinez to leave the bus station altogether, nothing appears to have prevented him from simply not consenting to further searches and moving to another location in or around the bus station. Analysis of the foregoing factors supports a finding that the Government has met its burden of establishing that the encounter remained consensual and had not ripened into a seizure when Detective Garcia asked for consent to search Martinez's person and commenced to

do so. And, as it was not a seizure, it does not trigger application of the Fourth Amendment. *See Aquino*, *supra*.

Defendant Martinez next argues that the initial search of his person, where Detective Garcia felt the bulge that prompted the arrest, failed to provide probable cause for an arrest. He chiefly relies on three related Eighth Circuit cases in his argument: *United States v. Tovar-Valdivia*, 674 F.3d 918 (8th Cir. 1999); *United States v. Eustaquio*, 198 F.3d 918 (8th Cir. 1999); and *United States v. Jones*, 254 F.3d 692 (8th Cir. 2001). *Tovar*, *Eustaquio*, and *Jones* all address the extent to which concealed bulges detected by law enforcement officers can establish probable cause supporting an arrest. And, just as with Defendant Martinez, the cases all involve searches of travelers conducted at airports and bus stations.

In *Tovar*, an officer conducting a consensual search of Tovar's bag noticed bulges under the defendant's shirt. Concerned that the bulges might be weapons, the officer felt the bulges and "knew only that they were not part of Tovar's anatomy." 193 F.3d at 1027. On this basis, Tovar was handcuffed and his shirt unbuttoned to reveal narcotics strapped to his body. The Eighth Circuit held the officer lacked probable cause to arrest and search Tovar's person because he only knew that Tovar had traveled from Los Angeles, "a source city for narcotics…; he appeared to be in a hurry…and he carried a new bag," factors which are plainly susceptible to innocent explanations. *Id.* at 1028. As to the bulges, the officer only knew what they were not. They were not weapons, and they were not a part of Tovar's anatomy. *Id.* This, the Court held, was insufficient to justify the arrest and search.

*Eustaquio* involved an encounter at an airport taxi stand, where an officer questioned Eustaquio and performed a consensual search of her luggage, finding nothing. 198 F.3d 1068, 1070. He then asked her to pull her shirt tight against her upper body, but she did the opposite and

13

pulled it away from her body. Despite this, the officer stated that he saw a bulge under her shirt, and, without her permission, he reached out and poked the bulge, prompting her to bat his hand away. She was detained, and narcotics were subsequently found on her person. The Eighth Circuit held that the officer – who noticed that Eustaquio traveled alone, without checked luggage, with a one-way ticket purchased in cash, and who appeared to be nervous and in a hurry – lacked reasonable suspicion to justify the touching, and lacked probable cause for the arrest, even after Eustaquio declined to follow his instructions about her shirt and batted his hand away. *Id.* at 1070-71.

Finally, the *Jones* case involved the same airport and same officer as in *Eustaquio*. The officer approached Jones after observing Jones take an odd route through the terminal while repeatedly looking over his shoulder. The officer approached Jones at the taxi stand where Jones gave the officer permission to search his bag, but when asked if he would consent to a search of his person, Jones dodged the question, stating that he would take off his clothes if there was a problem. The officer, later claiming that a physical gesture on the part of Jones indicated his consent to be searched, touched a visible bulge which Jones attributed to a recent surgery. Despite this, Jones was arrested, and in the search incident to the arrest, cocaine was found strapped to Jones's body. 254 F.3d at 693-94.

The Eighth Circuit seriously questioned but ultimately deferred to the district court's finding that the initial search was consensual. 254 F.3d at 695-96. Nonetheless, the Court found that the observations relied on by the officer did not establish probable cause for the eventual arrest. *Id.* at 697-98. The Court found that Jones's behavior prior to the search was not particularly suspicious, contrary to the officer's belief, and, most notably, the touching of the bulge did not

14

"provide any new facts supporting probable cause," as the officer testified that after touching the bulge he could not rule out that the bulge was a bandage. *Id.* at 697-98.

At the other end of the spectrum is *United States v. Favela*, 247 F.3d 838 (8th Cir. 2001), a case cited favorably by the Government. In *Favela*, two officers in an airport approached a woman who consented to speak with them. She answered questions about her travel plans, and officers reviewed her identification and one-way ticket. When asked to pull her shirt tight against her body, she did, and the officers noticed a bulge. With her permission, an officer felt the bulge, and "[a]fter feeling two hard bulges he believed to be illegal drugs," the officer arrested Favela. The Court held that the consensual search did not require a reasonable suspicion and that the initial search provided the necessary probable cause for an arrest and more detailed search which revealed bundles of methamphetamine taped to Favela's body. *Id.* at 840-41; *see also United States v. Mendoza-Cepeda*, 250 F.3d 626 (8th Cir. 2001) (affirming a denial of suppression where an officer felt bundles taped around the defendant's body in a search found to be consensual).

While at first reading it is challenging to discern a clear rule from the above "bulge cases," the Eighth Circuit later distilled the above holdings in *United States v. Aquino*, where it explained the controlling rationale thusly:

> None of our prior cases have concluded the mere observation of a concealed bulge, standing alone, establishes probable cause to support an arrest. Instead, we have required the officer's initial observation of a concealed bulge to be buttressed by a *permissible* touching of the bulge, see *Favela*, 247 F.3d at 840, which then may give rise to probable cause *if* touching the bulge makes the presence of contraband "immediately apparent."

674 F.3d 918, 925 (8th Cir. 2012) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).[2]

The *Aquino* Court affirmed the granting of a suppression motion where an officer arrested a

---

[2] The Court finds *Minnesota v. Dickerson*, quoted by *Aquino* above, to be particularly relevant to the present issue. There, the Supreme Court explained the relationship between "tactile discoveries" of contraband with the plain view doctrine, stating: "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent…its

15

Case 4:19-cr-00400-SRB   Document 54   Filed 02/09/21   Page 15 of 19

defendant after observing, without touching, a bulge under his pant leg. The Eighth Circuit restated this rule again in *United States v. Guevara*:

> We have found that an officer does not have to actually see the contraband inside the bulge. Instead, the officer has to form a reasonable belief about what is in the bulge, based on something other than simply observing the exterior of the bulge. In the bulge cases, the officer may achieve this through a permissible touching of the bulge; if the officer believes she feels drugs or a weapon, the officer may have probable cause to arrest.

731 F.3d 824, 832 (8th Cir. 2013) (citing *Aquino*, *supra*).

This case is distinguishable from *Tovar*, *Eustaquio*, and *Jones* in several key respects. Unlike in *Tovar*, where the officer only knew the bulge was not part of Tovar's anatomy and not a weapon, Detective Garcia knew the hard bundle on Martinez's back was consistent with other bundles of narcotics he has found attached to people's bodies. Fact 20. Unlike in *Eustaquio*, the search of Martinez's person was consensual, and unlike in *Jones*, not only did the touching of the bulge provide new information supporting probable cause, Detective Garcia was not confronted with any plausible alternative that needed to be ruled out by further questioning. Detective Garcia is a veteran law enforcement officer with decades of experience in drug interdiction work, and he has personally encountered several hundred "body carriers." Facts 1, 4. His extensive experience made it "immediately apparent" that he was feeling bundles of illegal drugs taped to Defendant Martinez's body, and he therefore possessed the necessary probable cause to arrest and subsequently search Defendant Martinez.

The Court further notes that in the above cases, the odor of narcotics was not at all an issue. Had there been an odor of narcotics in *Tovar*, *Eustaquio*, *Jones*, and *Aquino*, perhaps those Courts would have found reasonable suspicion or probable cause sufficient to render those arrests lawful, but the absence of odor in *Favela* and *Mendoza-Cepeda* was not fatal to the government's case.

---

warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." 508 U.S. at 375-76.

16

Case 4:19-cr-00400-SRB    Document 54    Filed 02/09/21    Page 16 of 19

In both *Favela* and *Mendoza-Cepeda* officers cited little more than observations of minimally suspicious behavior prior to initiating consensual encounters, and at no point in either case was odor discussed. *Favela*, 274 F.3d at 839 (describing the officers' observations of the defendant prior to and during the encounter); *Mendoza-Cepeda*, 250 F.3d at 627 (describing the defendant walking quickly to the taxi stand where officers initiated a consensual encounter). It was the consensual touching of a bulge, and nothing else, that supported the arrests in both cases. The Court submits that the same is true here. The odor of heroin, or lack thereof, is not material where Detective Garcia's permissive touching of the bundle concealed under Martinez's clothes gave him enough information to establish probable cause.

Nevertheless, given the parties considerable effort presenting evidence related to heroin's odor or lack thereof, and to the extent reviewing courts could find the issue of odor relevant, the Court will address that issue. Although this Court recommends a finding that the Government has met its burden as to consent, and that the arrest and subsequent search were lawful, the Court is not convinced that Detective Garcia detected the odor of heroin as described.

He testified that he first noticed the odor while he was standing outside at the back of the Greyhound bus with K-9 Zina, searching the luggage compartment farthest from the passenger door. Facts 6, 7. Although he testifies that K-9 Zina indicated that she was "in the odor of narcotics" when passengers began exiting the bus, it is difficult to understand how a human, who is standing outdoors and in proximity to a recently arrived bus, with its own attendant odors of tires and exhaust, could detect the same. When he boards the passenger compartment Martinez had recently vacated, his K-9 does not alert at all. Fact 13.

Detective Garcia testified that other officers who were in the vicinity of Martinez did not report to Detective Garcia that they, too, detected an odor. Fact 11. Crucially, one officer was

17

standing near the bus station doorway when Martinez walked through it, and two more officers exited through the same doorway mere seconds after Martinez entered through it, presumably passing by each other as they did so. Fact 11. The Court can only presume that if those officers also detected the odor of narcotics, they would have indicated as much and searched diligently for the source. One would particularly expect this action if the odor was strong enough for Detective Garcia to again detect it in the lobby before approaching Defendant Martinez, as he testifies that he did. Fact 15. Although the other officers were apparently not as experienced as Detective Garcia, he confirmed that some of the other officers had personally participated in arrests and seizures of heroin, and that this was not their first exposure to the drug. Fact 25. The Court also notes that Detective Garcia testified that he told Detective Lanaman that he detected the odor of heroin, and Detective Lanaman was walking with Detective Garcia in the bus station lobby when Detective Garcia again detected the odor. However, nothing indicates that Detective Lanaman perceived the same or acted on Detective Garcia's statement.

The evidence also established that the heroin was tightly packed in layers of cellophane, packing tape, black carbon paper, and menthol rub, with photos indicating that the officers resorted to using a knife to first remove the tightly wrapped bundle from Martinez's body and then to reveal its contents. Fact 22, Ex. 6-15. While this does not guarantee that an odor could not escape the packaging, it is difficult to accept that only one person detected it, particularly when at great distances from Defendant Martinez.

The Court notes that the Government has otherwise failed to corroborate Detective Garcia's testimony as to the odor in any meaningful respect. The expert testimony did establish that it was possible that this heroin had an odor, a possibility that Defendant Martinez was unable to successfully refute. Facts 32, 33, 36, 37. However, absent from the courtroom were any other

18

witnesses who had firsthand knowledge of this heroin and any attendant odor it may have emitted. Some of the officers, including Detective Lanaman, accompanied Detective Garcia and Defendant Martinez to the interdiction office where the bundles were removed and field tested. Facts 21, 22. If the heroin smelled strong enough for Detective Garcia to detect it as he testified, others must have noticed the odor, if not while escorting Martinez back to the office, then in the confines of the office itself. None of the other officers were called to testify.

This lack of corroboration is telling. Where video footage corroborates the factors relevant to the issue of consent, nothing corroborates the testimony as to odor. But, as discussed, the issue of odor is not dispositive in this case. Even without the odor, Martinez was not seized prior to being arrested. The initial search was consensual, and Detective Garcia possessed the necessary probable cause to justify the arrest. Suppression should be denied on that basis.

## V. **CONCLUSION**

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this Report and Recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

DATED:     February 9, 2021            *s/ Jill A. Morris*
                                                                                              Honorable Jill A. Morris
                                                                                              United States Magistrate Judge